## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN DOE 1and JOHN DOE 2,

      Plaintiffs,

v.

MICHAEL TUSTIN; MICHAEL
TUSTIN, JR.; ROXANN TUSTIN;
and TUSTIN INVESTMENTS LLC,
a Michigan limited liability company,

      Defendants.

**JURY TRIAL DEMANDED**

Case No.
Hon.
Mag.

---

Nakisha N. Chaney (P65066)
Jennifer B. Salvatore (P66640)
SALVATORE PRESCOTT & PORTER
Counsel for Plaintiffs
105 E. Main Street
Northville, MI 48167
(248) 679-8711
chaney@spplawyers.com
salvatore@spplawyers.com

Jessica Glynn (P81140)
YWCA Kalamazoo
Co-Counsel for Plaintiffs
353 E. Michigan Avenue
Kalamazoo, MI 49007
(269) 345-5595
jglynn@ywcakalamazoo.org

---

## COMPLAINT AND JURY DEMAND

      Defendant MICHAEL TUSTIN compelled Plaintiffs JOHN DOE 1 and JOHN DOE 2 to

perform labor by means of assault, intimidation, threatened abuse of the legal process and fraud.

Plaintiffs now bring this action for forced labor and human trafficking against Tustin, and those

who knowingly benefitted, under the Trafficking Victims Protection Reauthorization Act, 18

U.S.C. § 1595, Michigan's Human Trafficking Victims Compensation Act, M.C.L. § 752.983, and related state claims.

## PARTIES, JURISDICTION AND VENUE

1.   Plaintiffs John Doe 1 and John Doe 2 are individuals who reside in Kalamazoo County, Michigan.

2.   Defendant Michael Tustin ("Tustin") is an individual who resides in Kalamazoo County, Michigan.

3.   Defendant Roxann Tustin ("R. Tustin") is Tustin's wife and business partner, who resides in Kalamazoo County, Michigan.

4.   Defendant Michael Tustin, Jr. ("Tustin Jr.") is Tustin's son and business partner and/or agent, who, upon information and belief, resides in Kalamazoo County, Michigan.

5.   Defendant Tustin Investments LLC ("Tustin Investments") is a domestic limited liability company with its principal place of business in Kalamazoo County, Michigan.

6.   The events and omissions giving rise to this complaint occurred at various locations within Kalamazoo County, Michigan.

7.   The Court has original jurisdiction over Plaintiffs' federal human trafficking claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1595.

8.   The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

9.   Venue is in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## GENERAL ALLEGATIONS

10. John Doe 1 is a Mexican national who was born into an impoverished Mexican community.

11. Starting at the age of six, John Doe 1 had to work to help support his family, which often

lacked sufficient food to eat.

12. Initially, John Doe 1 worked after school and on Saturdays.

13. However, when he was 13 years old, John Doe 1 stopped going to school to work full-time.

14. Shortly thereafter, John Doe 1's father fell ill and was unable to work, leaving John Doe 1 and several uncles to support the family.

15. For many years, John Doe 1 worked for his father and family in Mexico, often working more than one job.

16. In 2009, John Doe 1 traveled to the United States and eventually moved to Kalamazoo, Michigan, where he resided with his uncle.

17. Shortly after arriving in Kalamazoo, John Doe 1 was introduced to Defendant Michael Tustin.

18. Tustin owns, renovates and rents multiple properties ("real estate enterprise") within the State of Michigan.

19. Tustin's real estate enterprise is a family-run, for-profit business in which Defendants participate and operate for the financial benefit of themselves and the Tustin family.

20. During the relevant time, Tustin owned properties, handled financial matters, and, among other things, recruited, paid, transported, directed and supervised workers as part of the enterprise.

21. R. Tustin owned properties, handled financial matters, paid workers, transported workers, and was present at worksites as part of the enterprise.

22. Tustin Jr. supervised and directed workers at the worksites as part of the enterprise.

23. Tustin also owns Tustin Investments, which is involved in Tustin's real estate enterprise and is an entity through which Tustin purchases, owns and/or rents property.

24. Tustin offered John Doe 1 a job performing general home repair and maintenance work,

including roof repair and replacement, laminate floor installation, drywall installation, and snow removal.

25. Tustin informed John Doe 1 that his work hours would be 9:00 a.m. to 7:00 p.m., six days a week, Monday through Saturday, with an unpaid one-hour lunch each day.

26. Tustin promised, and John Doe 1 accepted, a starting wage of $10.00 per hour, with the opportunity to increase the hourly wage to $10.50 per hour after two weeks, and to $11.00 per hour after one month, depending on John Doe 1's quality of work.

27. Tustin told John Doe 1 that he would be off work for July 4 and Christmas and that on December 22, John Doe 1 would receive a Christmas bonus.

28. Relying on Tustin's representations, John Doe 1 accepted the job.

29. During John Doe 1's first several days of employment, Tustin directed him to lay laminate flooring in one home and to remodel and paint a separate property.

30. During the first week, John Doe 1 asked Tustin about the pay date.

31. Tustin told John Doe 1 that there was not a set pay date, but that workers were paid every twelve to fifteen days.

32. Over the next couple of weeks, John Doe 1 continued to work for Tustin, for which Tustin told John Doe 1 he had done a good job and promised him a pay raise.

33. At the end of the couple of weeks, John Doe 1 again asked Tustin when he would be paid.

34. Tustin responded that he was not going to pay John Doe 1 any money, claiming that John Doe 1 missed work days, had poor quality of work, and took too long to complete jobs, causing Tustin to lose rental income.

35. Tustin's response shocked John Doe 1 because Tustin previously complimented his work and promised him a raise.

4

36. Because Tustin did not pay him, John Doe 1 did not return to work the following Monday.

37. When John Doe 1 did not show up, Tustin came to John Doe 1's uncle's trailer, where John Doe 1 resided, looking for him.

38. When he arrived, Tustin pounded on the trailer's windows and doors, screaming that John Doe 1 needed to get back to work and repeating that he was not paying him for the work that was already done.

39. John Doe 1 feared Tustin, so he stayed in the trailer until Tustin left.

40. The following day, John Doe 1 did not go to work.

41. Again, Tustin came to the trailer at which John Doe 1 was living, looking for him.

42. In hopes of deterring Tustin, John Doe 1's teenage cousin went outside and told Tustin that John Doe 1 had gone to a different town to work and no longer lived at the trailer.

43. Tustin threatened the cousin that if John Doe 1 did not return to work for him, he would call immigration.

44. Tustin also warned that John Doe 1 would have to pay for rental losses, materials, and time spent by the manager translating for him if he did not come back to work.

45. John Doe 1, who lacked legal immigration status and feared detention and deportation of himself and his family, returned to work the next day.

46. John Doe 1 also found another place to live to spare his uncle and his family from Tustin's return and any problems that Tustin might cause.

47. On John Doe 1's return to work, Tustin yelled at him about the money that he lost on a rental.

48. However, Tustin also told John Doe 1 that if he did good work, he would receive an extra dollar an hour.

49. After about one and a half months of work, Tustin paid John Doe 1 for the first time.

50. The pay was made by personal check and did not reflect John Doe 1's hours worked, pay rate or itemized deductions, in violation of M.C.L. § 408.479(2).

51. Tustin always paid John Doe 1 by either personal check or cash, never providing information such as the hours worked, pay rate and deductions.

52. The pay also did not include John Doe 1's first ten days of work, nor did it fully compensate John Doe 1 for the hours he worked thereafter.

53. John Doe 1 often worked Monday through Saturday and occasionally on Sunday.

54. Although John Doe 1 was told that his hours would be 9:00 a.m. to 7:00 p.m., Tustin or his manager frequently required John Doe 1 to work later, often until 9:00 or 10:00 p.m., and on some occasions, as late as 2:00 a.m.

55. Tustin required John Doe 1 to work at different job sites, to which Tustin and R. Tustin would sometimes transport John Doe 1.

56. Tustin also made John Doe 1 perform work for Tustin's friends or family.

57. Tustin did not compensate John Doe 1 for all of his regular hours, nor did he compensate him for the extended hours.

58. Tustin also did not compensate John Doe 1 for time spent on jobs that took longer than Tustin desired, for middle-of-the-night emergency repairs, for snow removal, and for jobs that Tustin directed John Doe 1 to perform for Tustin's friends or family.

59. In addition to not paying full wages, Tustin deducted money from John Doe 1's paycheck, without consent, including for lunch time that John Doe 1 did not take, housing inspection costs, beer, and materials Tustin said were damaged, but for which he did not provide any evidence of damage or cost.

6

60. Tustin made efforts to keep employees from knowing what other workers were being paid.

61. Workers were typically paid on different days.

62. Tustin also directed John Doe 1 to not discuss his pay with other workers in violation of M.C.L. § 408.483a.

63. John Doe 1 was paid from a joint bank account belonging to Tustin and his wife, R. Tustin.

64. R. Tustin, who was intimately involved in the real estate enterprise, often wrote and signed John Doe 1's paychecks, so she was aware that John Doe 1 was being underpaid.

65. R. Tustin was also often present at worksites at which Plaintiff worked and thus witnessed the conditions under which John Doe 1 labored, including observing Tustin's abusive interactions with John Doe 1.

66. John Doe 1 started keeping his own record of hours worked.

67. The amount of money Tustin paid John Doe 1 did not compensate John Doe 1 for the number of hours he worked.

68. Although John Doe 1 worked at least 54 hours a week, often more, Tustin only paid John Doe 1 an average of about $350.00 to $400.00 every two weeks.

69. When John Doe 1 gave Tustin his records to show that he worked more hours than for what he was paid, Tustin tore the records up.

70. In addition to illegally withholding wages, Tustin regularly berated, assaulted and threatened John Doe 1.

71. Tustin constantly derided and hurled racial epithets at John Doe 1, including calling him a "son of a bitch," "asshole," "idiot," "wetback" and "pussy."

72. Tustin Jr., who often supervised and directed employees, including John Doe 1, was similarly abusive.

7

73. Tustin had angry, violent outbursts in which he would, among other things, kick around equipment, smash a hole in the wall with a hammer, and rip up work with which he was not satisfied with a crowbar.

74. Tustin frequently threatened to call immigration or the police on John Doe 1 and the other Latino workers.

75. Tustin reminded Latino employees daily that there was nothing they could do to him because of their immigration status.

76. Tustin made comments such as, "What can you do to me?" and "You cannot touch me because I'm allowed to call immigration on you."

77. Tustin also made comments such as, "you are a wetback," you are illegal," and, "I can have you deported whenever I want."

78. Several times when John Doe 1 tried to quit, Tustin responded with threats, including "Oh, you're going to Mexico? Don't worry about your ticket, I will call immigration."

79. Tustin did not threaten, abuse, assault or intimidate his Caucasian employees in this manner.

80. Tustin has friends in the police department who stopped by his job sites to visit.

81. Police officers often showed up at job sites to visit and talk to Tustin; no official business was conducted.

82. On at least two occasions, Tustin told police officers who came to the job site that workers, including John Doe 1, did not have driver's licenses and that the officer should pull them over if he saw them driving.

83. On one occasion, a police officer who was friends with Tustin came to the site at which John Doe 1 was working.

84. The officer pulled up in his patrol car, called John Doe 1 over and asked him if he was a certain person, using John Doe 1's first name.

85. Tustin's manager walked up and said that the officer was just joking and that he was Tustin's friend.

86. John Doe 1 understood the officer's visit to be Tustin's message to him that Tustin had friends on the police force and that John Doe 1 had no power to report Tustin's abuse.

87. When police interactions like this occurred, John Doe 1 and other workers would hide until the manager came and "assured" them that Tustin was just joking.

88. Tustin intentionally instilled fear of law enforcement as a means to control John Doe 1.

89. Tustin pretended to call immigration on his phone while John Doe 1 was working.

90. Terrified, John Doe 1 grabbed his things and left. He did not return the following day.

91. Thereafter, as was the pattern, the manager came to get John Doe 1, telling him that Tustin was kidding and to get back to work.

92. John Doe 1 tried quitting his job multiple times.

93. When John Doe 1 did not show up for work, Tustin came to his house, banged on the door and windows, and threatened him until John Doe 1 returned to work.

94. Tustin also called around to other employers in construction work and disparaged John Doe 1, saying that he was a bad worker and did not know what he was doing, so that John Doe 1 would not be hired.

95. Even when John Doe 1 was sick or there was an emergency, Tustin forced him to return to work.

96. After about a year, to get away from Tustin, John Doe 1 moved to another town and found a job with a restaurant, where he worked for about a year.

97. Shortly thereafter John Doe 1 ran into Tustin's manager who told John Doe 1 that Tustin was looking for him and wanted him back to work.

98. John Doe 1 responded that he had another job.

99.  However, Tustin then found John Doe 1 and directed him to return to work.

100.  John Doe 1, who believed he had no choice, complied.

101.  Upon his return to work, things quickly reverted to the way they were previously.

102.  Tustin paid less than $500 for two-week pay periods in which John Doe 1 worked weekly between 54 and more than 60 hours of back-breaking, exhausting work.

103. Tustin continued to be verbally and physically abusive.

104.  Breaks were mostly disallowed, including lunch, water and bathroom breaks, and workers were not permitted to use the bathroom at Tustin's properties.

105.  Tustin never provided any type of basic safety gear.

106.  On one occasion, there was a death at a property. Tustin directed John Doe 1 to clean up, by hand, blood and skin that was stuck to the floor, using harsh chemicals and without a mop or gloves.

107.  John Doe 1 often had cuts and chemical burns on his hands because he did not have protective gear.

108.  John Doe 1 did not want to work for Tustin.

109.  However, Tustin made it clear that John Doe 1 had to work for him, saying things such as, "you need to work or I'm going to kick you" or "get to work, motherfucker."

110.  Sometimes, Tustin pushed John Doe 1 down to the floor by his shoulders, physically forcing him to continue working.

111.  As a result of the severe emotional and mental stress of working for Tustin, John Doe 1

developed an ulcer, for which he had surgery in August 2016.

112. The day after surgery, Tustin called John Doe 1 and told him to get back to work, even though it was not medically safe.

113. On December 17, 2016, John Doe 1 worked his last day with Tustin.

114. On that day, John Doe 1 approached Tustin about receiving his paycheck.

115. Tustin, who was intoxicated, became aggressive.

116. For about 15 minutes, Tustin pushed and punched John Doe 1 while John Doe 1 tried to use his arms to block the blows.

117. After the assault, John Doe 1 left and did not return.

118. Tustin tried to force John Doe 1 to come back to work for him.

119. Tustin showed up at John Doe 1's home and banged on the door and windows as John Doe 1's family hid inside.

120. Tustin's intimidation continued for weeks, prompting John Doe 1 to take protective measures, including, among other things, relocating his family.

121. John Doe 1 continues to live in fear of Tustin.

**Plaintiff John Doe 2**

122. Plaintiff John Doe 2 was born in Mexico.

123. In 1995, when he was 12 years old, John Doe 2 entered the United States with legal authorization.

124. John Doe 2's authorization expired while he was still a child.

125. At the age of 15, John Doe 2 was forced to leave school and start working to help support his family.

126. Over the following years, John Doe 2 worked a number of jobs to support himself and

his parents, including working as an industrial launderer, greenhouse worker, sprinkler system installer, and custodian.

127.  In the summer of 2013, John Doe 2 met Tustin.

128.  Tustin hired John Doe 2 to do construction and building maintenance for his rental properties, including drywall installation, painting, carpet removal, laminate floor installation and building maintenance.

129.  Tustin told John Doe 2 that he would work five to six days a week, from 9:00 a.m. to 5:00 p.m., for $9.00 an hour.

130.  Tustin said he would pay John Doe 2 every two weeks by personal check and, if John Doe 2 proved he could do the job, Tustin would give him a raise.

131.  John Doe 2's experience working for Tustin was similar to John Doe 1's.

132.  On his first day, John Doe 2 worked with John Doe 1 under Tustin's supervision.

133.  Tustin frequently made comments telling John Doe 2 to hurry up, including saying, "Come on you piece of shit, I'm paying you money," and "I know you are wetbacks so don't think I'm leaving you alone."

134.  John Doe 2's days started at 9:00 a.m. and did not end until as late as 8:00 p.m.

135.  Tustin kicked equipment around, called John Doe 2 derogatory and racial names just as he had to John Doe 1, including "wetback," "son of a bitch," "asshole," "idiot" and "pussy."

136.  Tustin constantly reminded John Doe 2 that there was nothing he could do because of his undocumented immigration status and threatened to call immigration on him and others.

137.  Tustin would not allow John Doe 2 to take bathroom breaks.

138.  Tustin did not give John Doe 2 safety equipment, such as knee pads or safety glasses.

139.  Sometimes John Doe 2's knees were so swollen that he could not work.

140.   Often, when John Doe 2 got up from the floor when he was working, Tustin grabbed his face and smacked him back down.

141.   After the first couple of weeks, John Doe 2 asked for his paycheck.

142.   Tustin initially said he would pay him the next day, but he did not.

143.   John Doe 2 asked several more times for his paycheck and got the same answer.

144.   After the fourth time or so, Tustin told John Doe 2 to "go back to work, you have shit to do. I will pay you later."

145.   Tustin later told John Doe 2 that he was not going to pay him at all and there was nothing he could do about it.

146.   John Doe 2 was fearful of Tustin and believed that he had no choice but to work for Tustin because of Tustin's threats and assaults.

147.   John Doe 2 was also aware of John Doe 1's unsuccessful efforts to quit and Tustin's reaction to them.

148.   After several weeks, John Doe 2 began having suicidal thoughts.

149.   After a month or so, John Doe 2 could not take it anymore, and he stopped working for Tustin.

150.   John Doe 2 hid in his home for weeks after quitting, terrified that Tustin would come to his home and hurt him or his family.

151.   Tustin attempted to find out from John Doe 1 where John Doe 2 lived, but John Doe 1 did not tell him.

152.   John Doe 2 still fears Tustin and takes steps to avoid running into him.

153.   As a result of his experience, John Doe 2 was traumatized and experienced significant harm, including suicidal thoughts, anxiety, depression and insomnia.

**COUNT I**
**FORCED LABOR**
**18 U.S.C. §§ 1589, 1595**
*(against Tustin on behalf of all Plaintiffs)*

154. Plaintiffs incorporate here all previously stated allegations.

155. The activity at issue in this case touches upon and involves interstate commerce.

156. The parties frequently communicated by, among other means, cellular communication, which necessitated, upon information and belief, the use of cellular services and/or transmission equipment originating outside the State of Michigan.

157. During the trafficking, Plaintiffs used Hitachi-branded tools, which are developed, manufactured and distributed globally and throughout the United States.

158. Plaintiffs also used Dewalt- and Milwaukee-branded tools, which are manufactured outside of Michigan and transported into the state for purchase and use.

159. Tustin required Plaintiffs to perform work under his supervision and direction, or under the supervision and direction of Tustin's agent, for the benefit of Tustin and others.

160. The work that Plaintiffs provided had economic value.

161. Tustin knowingly provided and obtained Plaintiffs' labor and services by means of force, threat of serious harm, actual harm, physical restraint, threatened abuse of the law or legal process, psychological coercion, fraudulent misrepresentation, and engagement in a scheme or pattern to cause Plaintiffs to believe that they or their families would suffer serious harm.

162. Tustin's means of force, fraud and coercion included, but are not limited to, threatening immigration detention and deportation, physical assault and threat of physical assault, reputational harm, misrepresentation of terms of employment, illegal wage withholdings and deductions, and intimidation.

163. Plaintiffs suffered substantial physical, emotional, mental and financial harm as a result

14

of Tustin's conduct.

## COUNT II
### TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT
### LABOR TRAFFICKING
### <u>18 U.S.C. §§ 1590, 1595</u>
*(against Tustin on behalf of all Plaintiffs)*

164.  Plaintiffs incorporate here all previously stated allegations.

165.  Tustin knowingly recruited, transported, obtained and provided Plaintiffs for labor and services by means of force, fraud and coercion, including through threatening immigration detention and deportation, actual physical assault and threat of physical assault, reputational harm, misrepresentation of terms of employment, illegal wage withholdings and deductions, and intimidation.

166.  Plaintiffs suffered substantial physical, emotional, mental and financial harm as a result of Tustin's conduct.

## COUNT III
### TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT
### BENEFITING FROM TRAFFICKING VENTURE
### <u>18 U.S.C. § 1595</u>
*(against all Defendants on behalf of all Plaintiffs)*

167.  Plaintiffs incorporate here all previously stated allegations.

168.  Tustin's real estate enterprise constitutes a "venture" within the meaning of the term in 18 U.S.C. § 1595(a).

169.  The venture, through Tustin, engaged in forced labor and labor trafficking in violation of 18 U.S.C. § 1589 and 18 U.S.C. § 1590.

170.  Defendants knowingly received financial benefits and things of value from participating in a venture that they knew involved forced labor and trafficking, including wage deductions and withholdings, as well as the increased rental value arising from Plaintiffs' labor and services.

## COUNT IV
## MICHIGAN HUMAN TRAFFICKING VICTIMS COMPENSATION ACT
## LABOR TRAFFICKING
## M.C.L. § 752.983
(*against Tustin on behalf of John Doe 1*)

171.  Plaintiffs incorporate here all previously stated allegations.

172.  In violation of M.C.L. § 750.462b and § 750.462d, Tustin knowingly recruited, enticed, transported, provided and obtained John Doe 1 for forced labor and services by means of assault, threatened harm, physical restraint, threatened immigration detention and deportation, misrepresentations of employment terms and conditions, illegal wage withholdings and deductions, and engagement in a scheme or pattern to cause Plaintiff to believe that he or his family would suffer serious harm if he did not provide labor.

173.  As a result of Tustin's conduct, John Doe 1 suffered serious bodily injury, including an ulcer requiring surgery, as well as substantial financial, emotional and psychological harm.

## COUNT V
## MICHIGAN HUMAN TRAFFICKING VICTIMS COMPENSATION ACT
## BENEFITING FROM TRAFFICKING ENTERPRISE
## M.C.L. § 752.983
(*against all Defendants on behalf of John Doe 1*)

174.  Plaintiffs incorporate here all previously stated allegations.

175.  The real estate enterprise constitutes an "enterprise" as defined in M.C.L. § 750.159f.

176.  The enterprise, through Tustin, engaged in labor trafficking in violation of, among other things, M.C.L. § 750.462b.

177.  Defendants knowingly benefitted financially and by receiving things of value from participation in the enterprise, including wage deductions and withholdings, as well as increased rental property value arising from Plaintiffs' labor and services.

## COUNT VI
## MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT
## NATIONAL ORIGIN HARASSMENT AND DISCRIMINATION
## M.C.L. § 37.2202
(*against Tustin on behalf of John Doe 1*)

178.  Plaintiffs incorporate here all previously stated allegations.

179.  Plaintiff is a Mexican national.

180.  Tustin is Caucasian.

181.  Tustin berated, assaulted and otherwise treated John Doe 1 and other Latino workers differently than he treated Caucasian employees, including with regard to their conditions of employment.

182.  Tustin also frequently disparaged Plaintiff and other workers of Latino descent, calling them, among other things, "wetbacks."

183.  Tustin's conduct caused Plaintiff significant harm, including financial, physical, emotional and psychological injury.

## COUNT VII
## ASSAULT & BATTERY
(*against Tustin on behalf of John Doe 1*)

184.  Plaintiffs incorporate here all previously stated allegations.

185.  Tustin attempted to and did intentionally make aggressive, violent and hostile nonconsensual contact with John Doe 1 or things closely associated with him, including but not limited to, pushing and punching Plaintiff, which caused Plaintiff to fear and suffer imminent harm.

**COUNT VIII**
**WORKFORCE OPPORTUNITY WAGE ACT**
**FAILURE TO PAY MINIMUM WAGE AND OVERTIME**
**M.C.L. § 408.412, *et seq*.**
(*against Tustin on behalf of John Doe 1*)

186.  Plaintiffs incorporate here all previously stated allegations.

187.  At all relevant times, Tustin employed two or more persons.

188.  John Doe 1 was employed by Tustin on Tustin's premises or at a site designated by Tustin.

189.  In 2015, Michigan's minimum hourly wage rate was $8.15 per hour.

190.  In 2016, Michigan's minimum hourly wage rate was $8.50 per hour.

191.  Tustin failed to pay John Doe 1 the statutory minimum hourly wage.

192.  Tustin violated M.C.L. § 408.413.

193.  John Doe 1 regularly worked in excess of 40 hours per week.

194.  Tustin failed to pay John Doe 1 compensation at the rate of 1 ½ times his promised pay rate for hours worked in excess of 40 hours per week.

195.  Tustin violated M.C.L. § 408.414a.

196.  John Doe 1 suffered substantial financial loss as a result of Tustin's conduct.

**COUNT IX**
**BREACH OF CONTRACT**
(*against Tustin on behalf of all Plaintiffs*)

197.  Plaintiffs incorporate here all previously stated allegations.

198.  Tustin and John Doe 1 entered into a contract in which Tustin agreed to pay John Doe 1 for labor and services a starting wage of $10.00 per hour, with the opportunity to increase the hourly wage to $10.50 per hour after two weeks, and to $11.00 per hour after one month.

199.  Tustin also agreed to pay John Doe 1 a bonus at Christmas time.

18

200.  Tustin and John Doe 2 entered into a contract in which Tustin agreed to pay John Doe 2 for labor and services a wage of $9.00 an hour.

201.  Plaintiffs provided the labor and services.

202.  Tustin failed to pay Plaintiffs as agreed and otherwise failed to perform his agreed-upon obligations.

203.  Plaintiffs suffered harm as a result of Tustin's breach of contract.

## COUNT X
## PROMISSORY ESTOPPEL
(*against Tustin on behalf of all Plaintiffs*)

204.  Plaintiffs incorporate here all previously stated allegations.

205.  Tustin made clear and definite promises to pay Plaintiffs a certain wage rate and other compensation.

206.  Tustin did not pay Plaintiffs as promised although he benefitted from their labor and services.

207.  A refusal to enforce Tustin's promise would unjustly sanction a fraudulent and illegal scheme and result in other injustices.

## COUNT XI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(*against Tustin on behalf of John Doe 1*)

208.  Plaintiffs incorporate here all previously stated allegations.

209.  Tustin intentionally and recklessly inflicted severe emotional distress, which he was certain or substantially certain his conduct would cause.

210.  Tustin's conduct, which included terrorizing, trafficking and assaulting John Doe 1, was extreme, outrageous and exceeded all possible bounds of decency.

211.  Tustin's conduct is intolerable in any civilized community and it has caused, and

continues to cause, Plaintiff severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter an order awarding Plaintiffs all

damages to which they are entitled, including but not limited to:

a.  economic damages, including but not limited to those allowable under 18 U.S.C. § 1595, M.C.L. § 752.983, and M.C.L. § 37.2801;

b.  noneconomic damages for pain and suffering, fear, psychological trauma, severe emotional distress, and other harm, including but not limited to those allowable under 18 U.S.C. § 1595, M.C.L. § 752.983, and M.C.L. § 37.2801;

c.  punitive damages, including but not limited to those allowable under 18 U.S.C. § 1595;

d.  liquidated damages, including but not limited to those allowable under M.C.L. § 408.419;

e.  attorney fees and costs as allowed under 18 U.S.C. § 1595, M.C.L. § 408.419, M.C.L. § 752.983, M.C.L. §§ 37.2801 and 2802; and

f.  all relief that this Court deems just and equitable.

Respectfully submitted,

/s/  Nakisha N. Chaney
Nakisha N. Chaney (P65066)
Jennifer B. Salvatore (P66640)
SALVATORE PRESCOTT & PORTER PLLC
Attorneys for Plaintiff
105 E. Main Street
Northville, MI 48167
(248) 679-8711

Jessica Glynn (P81140)
YWCA Kalamazoo
Co-Counsel for Plaintiffs
353 E. Michigan Avenue
Kalamazoo, MI 49007
(269) 345-5595

Dated: April 26, 2018

## <u>JURY DEMAND</u>

Plaintiffs demand a jury trial in this matter.

Respectfully submitted,

/s/  Nakisha N. Chaney
Nakisha N. Chaney (P65066)
Jennifer B. Salvatore (P66640)
SALVATORE PRESCOTT & PORTER PLLC
Counsel for Plaintiff
105 E. Main Street
Northville, MI 48167
(248) 679-8711

Jessica Glynn (P81140)
YWCA Kalamazoo
Co-Counsel for Plaintiffs
353 E. Michigan Avenue
Kalamazoo, MI 49007
(269) 345-5595

Dated: April 26, 2018